# EXHIBIT A

WILMER CUTLER PICKERING HALE AND DORR LLP
Christopher T. Casamassima (CA SBN: 211280)
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Tel.: (213) 443-5374
Fax: (213) 443-5400
Email:  chris.casamassima@wilmerhale.com

John Butts (MA SBN: 643201) *Admitted Pro Hac Vice*
Timothy Perla (MA SBN: 660447) *Admitted Pro Hac Vice*
Jessica Lisak (MA SBN: 680207) *Admitted Pro Hac Vice*
Stephen N. Provazza (MA SBN: 691159) *Admitted Pro Hac Vice*
Paloma Naderi (MA SBN: 696679) *Admitted Pro Hac Vice*
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
Email: john.butts@wilmerhale.com
Email: timothyperla@wilmerhale.com
Email: jessica.lisak@wilmerhale.com
Email: stephen.provazza@wilmerhale.com
Email: paloma.naderi@wilmerhale.com

Attorneys for Defendant
WEBLOYALTY.COM, INC.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN PARK, on behalf of himself and all others similarly situated <br><br> Plaintiff, <br><br> vs. <br><br> WEBLOYALTY.COM, INC., a Delaware corporation; DOES 1 through 50, inclusive <br><br> Defendants. | Case No. 12-CV-1380-LAB-JMA <br><br> **CLASS ACTION** <br><br> **WEBLOYALTY'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** <br><br> Date: October 15, 2018 <br> Time: 11:15 a.m. <br> Courtroom: 14A <br> Honorable Larry A. Burns |

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................... 1

II.     BACKGROUND ................................................................................ 3

        A.      Plaintiff's Enrollment ................................................................ 3

        B.      Putative Class Members' Varied Enrollment Experiences ........ 6

        C.      This Litigation ......................................................................... 9

III.    ARGUMENT..................................................................................... 10

        A.      Plaintiff Has Not Proven Predominance .................................. 10

                1.      The EFTA Authorization Claim Presents Individualized
                        Issues .......................................................................... 11

                2.      The Conversion Claim Presents Individualized Issues.. 14

                3.      The UCL Claim Presents Individualized Issues ............ 15

                4.      The Statute of Limitations Raises Additional
                        Individualized Issues As to All Claims.......................... 18

        B.      In the Alternative, Any Class Must Exclude People Who Gave
                Releases Or Received Full Refunds .......................................... 24

IV.     CONCLUSION................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Armstrong v. Martin Marietta Corp*, 138 F.3d 1374 (11th Cir. 1998)...................22

*Aryeh v. Canon Bus. Sols., Inc*., 55 Cal. 4th 1185 (2013) ...............................22, 23

*Bank of New York v. Fremont Gen. Corp*., 523 F.3d 902 (9th Cir. 2008) ..........................................................................................14

*Berger v. Home Depot USA, Inc*., 741 F.3d 1061 (9th Cir. 2014) ..........................16

*Berry v. Webloyalty*, 517 F. App'x 581 (9th Cir. 2013) ...................................11, 25

*Berry v. Webloyalty, Inc.*, No. 10-cv-1358-H, 2011 WL 1375665 (S.D. Cal. Apr. 11, 2011)..........................................................................11, 21

*Bott v. Vistaprint USA Inc*., 392 F. App'x 327 (5th Cir. 2010) .............................11

*Broussard v. Meineke Disc. Muffler Shops, Inc*., 155 F.3d 331 (4th Cir. 1998)..........................................................................................12

*China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018) ..............................................21

*Collins v. Vill. of Palatine*, 875 F.3d 839 (7th Cir. 2017) .......................................23

*Colman v. Theranos, Inc*., --- F.R.D. ---, No. 16-cv-06822-NC, 2018 WL 2463097 (N.D. Cal. May 31, 2018).......................................................15

*Connelly v. Hilton Grand Vacations Co*., 294 F.R.D. 574 (S.D. Cal. 2013) ............................................................................................11

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 20016)..........................13, 25

*Farrington v. A. Teichert & Son, Inc*., 59 Cal. App. 2d 468 (Ct. App. 1943) ............................................................................................14

*Giovanniello v. ALM Media, LLC*, 726 F.3d 106 (2d Cir. 2013) ..........................22

*Hall v. City of Los Angeles*, 697 F.3d 1059 (9th Cir. 2012) ...................................11

*Harvey v. Google, Inc*., No. 15-CV-03590-EMC, 2015 WL 9268125 (N.D. Cal. Dec. 21, 2015)..........................................................................19

*Henson v. Fidelity Nat'l Fin. Inc.*, No. 2:14-cv-01240-DDW, 2014
WL 1246222 (C.D. Cal. Mar. 21, 2014) ........................................23

*Hook v. Intelius, Inc.*, No. 5:10-cv-239, 2011 WL 1196305 (M.D. Ga.
Mar. 28, 2011) ........................................................................11

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, No. 2:11-
CV-07166-MRP, 2012 WL 1097244 (C.D. Cal. Mar. 9, 2012)...................22

*In re Vertrue Inc. Mktg. & Sales Practices Litig.*, 719 F.3d 474 (6th
Cir. 2013)..............................................................................22

*In re Wellpoint, Inc., Out of Network UCR Rates Litig.*, No. ML 9-
2074, 2016 WL 6645789 (C.D. Cal. July 19, 2016) ...................................23

*Javine v. San Luis Ambulance Serv., Inc.*, No. CV 13-07480, 2015
WL 12672090 (C.D. Cal. Jan. 13, 2015)........................................24

*L.S. v. Webloyalty.com, Inc.*, 673 F. App'x 100 (2d Cir. 2016) ..............................11

*Lim v. Helio, LLC*, No. CV 11-9183, 2012 WL 12884439 (C.D. Cal.
Apr. 18, 2012)........................................................................24

*Lopez v. G.A.T. Airline Ground Support, Inc.*, No. 09cv2268-IEG,
2010 WL 3633177 (S.D. Cal. Sept. 13, 2010) .............................................19

*Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950 (S.D. Cal. 2016) ....................................19

*Markus v. Gschwend (In re Markus)*, 313 F.3d 1146 (9th Cir. 2002)....................22

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).......................13, 25

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir.
2012) ...................................................................................13

*Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C 08-03894, 2011
WL 3476473 (N.D. Cal. Aug. 9, 2011) ........................................24

*Park v. Webloyalty.com, Inc.*, 685 F. App'x 589 (9th Cir. 2017).....................10, 17

*Park v. Webloyalty.com, Inc.*, No. 12CV1380-LAB, 2014 WL
4829465 (S.D. Cal. Sept. 29, 2014)............................................21

*Pelletier v. Pac. WebWorks, Inc.*, No. CIV S-09-3503 KJM, 2012 WL
43281 (E.D. Cal. Jan. 9, 2012) ..................................................20

- iii -

*Perez v. First Am. Title Ins. Co.*, No. CV-08-1184-PHX, 2010 WL
    1507012 (D. Ariz. Apr. 14, 2010) ...................................................... 19

*Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, No. CV 14-7242-DMG,
    2016 WL 5920345 (C.D. Cal. June 23, 2016) ................................... 16

*Roz v. Nestle Waters N. Am., Inc.*, No. 2:16-cv-04418-SVW-JEM,
    2017 WL 6942657 (C.D. Cal. Sept. 13, 2017) ........................... 12, 16

*Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 642 F. 3d 560
    (7th Cir. 2011) ................................................................................... 22

*Scott v. District of Columbia*, 87 F. Supp. 3d 291 (D.D.C. 2015) ........................ 23

*Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462 (S.D.N.Y.
    2016) .................................................................................................. 23

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) ................................. 12

*Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128 (N.D.
    Cal. 2010) .......................................................................................... 19

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) .............................. 13

*Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016) ............................ 13

*Vondersaar v. Starbucks Corp.*, 719 F. App'x 657 (9th Cir. 2018) ....................... 12

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................... 10

*Wike v. Vertrue, Inc.*, 566 F.3d 590 (6th Cir. 2009) .............................................. 19

*Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir. 2018) ............................... 16

*Williams v. Boeing Co.*, 517 F.3d 1120 (9th Cir. 2008) ........................................ 22

*Winkler v. DTE, Inc.*, 205 F.R.D. 235 (D. Ariz. 2001) .................................... 14, 15

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) .................. 10

## STATUTES, RULES, AND REGULATIONS

Fed. R. Civ. P. 15 ................................................................................................. 22

Fed. R. Civ. P. 23 ................................................................................................. 10

Electronic Funds Transfer Act, 15 U.S.C. § 1693 ....................................... *in passim*

Retail Online Shoppers' Confidence Act....................................................2, 9, 15, 22

Cal. Bus. & Prof. Code § 17200 ................................................. *in passim*

Cal. Bus. & Prof. Code § 17208 ........................................................................23

Cal. Code Civ. Proc. § 338 ................................................................22

Webloyalty.com, Inc. ("Webloyalty") respectfully submits this Opposition to Plaintiff's Motion to Certify and Accompanying Memorandum of Law (the "Motion" or "Mot."). Also submitted herewith are the Declaration of Timothy Perla ("Perla Dec."), which attaches all exhibits in the Appendix (cited herein as "Appx."), and the Declarations of Matthew Smith ("Smith Dec."), Elizabeth Schueler ("Schueler Dec."), and Brian A. Pinkerton ("Pinkerton Dec.").

## I.   PRELIMINARY STATEMENT

Defendant Webloyalty offers online savings programs that, in exchange for a monthly fee, provide members with access to retail discounts, discounted tickets, protection plans, and other benefits. Plaintiff enrolled in one of Webloyalty's programs in May 2009. He now asserts that he enrolled unknowingly and that Webloyalty took steps to avoid his becoming aware of the membership, including by using datapass to obtain his billing information. He makes these assertions notwithstanding: (i) his receipt of clear written disclosures when he enrolled, (ii) that Webloyalty emailed him *27 times* concerning the enrollment (emails that Plaintiff implausibly denies receiving), (iii) his repeated receipt of bank statements clearly showing the monthly fee; (iv) the existence of contemporaneous records proving that Plaintiff logged onto Webloyalty's website three times during the period that he claims to have been unaware of the membership; and (v) his refusal to accept a full refund offered to him before he ever filed litigation. Now, in a gambit to increase his leverage, Plaintiff seeks to certify three class claims. That request, however, fails.

***EFTA Claim:***  Plaintiff cannot certify a claim that Webloyalty engaged in unauthorized funds transfers in violation of the Electronic Funds Transfer Act because Ninth Circuit precedent from the appeal in this case holds that the claim turns on whether the transferor intentionally or negligently authorized funds transfers, a subjective and individualized standard. This makes sense: if someone knowingly enrolled in a Webloyalty program and agreed to pay the monthly fee,

then they are a customer, not a victim of an unauthorized funds transfer.  The law is well-settled that predominance is lacking where claims require examination of intent, because individual fact-finding is necessary.

*Conversion Claim:*  Plaintiff's conversion claim also turns on whether each putative class member provided "consent" for transfers of funds.  Thus, it raises the exact same individualized mental state issue that again defeats predominance.

*UCL Claim:*  the Court should not certify Plaintiff's UCL claim because:  (i) to the extent Plaintiff asserts a UCL unlawfulness claim based on an EFTA violation, it lacks predominance for the same reasons why the EFTA claim lacks predominance; (ii) to the extent Plaintiff asserts a UCL unlawfulness claim based on ROSCA, it turns on individualized facts concerning whether each putative class member supplied payment information to Webloyalty other than via datapass; and (iii) to the extent Plaintiff asserts a UCL unfairness claim challenging the enrollment process, it turns on the varied, individualized facts of each purchaser's enrollment experience—the process and disclosures varied widely over time, and there is no one-size-fits-all enrollment experience that could in one stroke be deemed unfair or not.

*Individualized Statute of Limitations Issues:*  Webloyalty stopped using datapass by January 2010, but Plaintiff did not sue until 2012 and did not assert most of his present claims until 2013.  Thus, every putative class member enrolled and had funds transfers prior to the relevant statutes of limitations.  As a result, every putative class member must invoke the discovery rule to attempt to assert a timely claim.  However, application of the discovery rule turns on individualized facts concerning notice that are antithetical to a finding of predominance.

Thus, the Court should find that predominance is lacking and should deny this Motion.  In the alternative, this Court should narrow the class definition to exclude persons who gave releases in connection with prior class settlements, or already received full refunds (and therefore lack standing).

- 2 -

## II.   BACKGROUND

### A.   Plaintiff's Enrollment

On May 19, 2009, Plaintiff purchased a gift certificate on GameStop's website.  Appendix ("Appx.") at 97 (relevant portions of Park Deposition Transcript ("Park Tr.")) (Park Tr. 106:9-13).  After completing his purchase, he was presented with a banner advertisement concerning Webloyalty's Complete Savings Program which, in exchange for a monthly fee, provides discounts of up to 50% off at various retailers, discounted tickets to movie tickets and other entertainment venues, restaurant discounts, travel and roadside protection, and other benefits and services.

Plaintiff clicked a link in the banner advertisement, which directed him to an Enrollment Page.  *See* Appx. 86-88.  The Enrollment Page laid out the terms of the offer to join Complete Savings, as well as information on how to cancel membership after enrollment, and in *seven separate locations*, the monthly cost of a Complete Savings membership and/or statements that the debit card Plaintiff used to purchase the gift certificate would be charged for the membership fee.  *See id*.  Plaintiff enrolled by entering his email address twice and clicking "YES!" right underneath bold language stating that by doing so, he was acknowledging that he had read the Offer and Billing Details and understood that his debit card data would be transferred from GameStop to Webloyalty for billing.  *Id.*  In accordance with the authorization and disclosures, Webloyalty received Plaintiff's payment information via datapass (*i.e.*, the same payment information he had used with GameStop) and began charging the agreed monthly fee of $12 following a trial period.  At the conclusion of the transaction, Plaintiff was presented with an Acknowledgment Page confirming the enrollment and providing him a copy of the offer and billing details.  *See* Appx. 89-90.

That same day, Webloyalty sent Plaintiff two emails reminding him of his authorization and providing detailed information about his membership, including

- 3 -

another copy of the offer and billing details, and the benefits available to him.  *See* Appx. at 2-5 (emails from Webloyalty).  Thereafter, and notwithstanding Plaintiff's false assertion that Webloyalty sought to conceal the existence of the membership, Webloyalty emailed Plaintiff at least ***25 more times*** concerning his membership and the Program.  *See* Appx. at 6-42 (compilation of emails Webloyalty sent Plaintiff).  Those emails included a reminder of the offer and billing details sent two weeks before Plaintiff's free trial was scheduled to expire and that he would be charged his first monthly fee on June 18, 2009.  Appx. at 10-11.  Although Plaintiff acknowledges that Webloyalty sent these emails to his correct email address, he denies receiving any of them.  Appx. at 98 (Park 129:3-20).

In accordance with the terms of the enrollment, Webloyalty charged Plaintiff's debit card $12 per month beginning on June 18, 2009.  Plaintiff could have viewed this charge immediately by viewing his online bank account because he engaged in online banking.  *See* Appx. at 102-103 (Plaintiff's Responses to Webloyalty's Interrogatories Nos. 11 and 12).  Plaintiff's bank statement covering May 23, 2009 through June 22, 2009 also clearly depicts this first $12 charge.  Appx. at 64 (Plaintiff's bank statement reflecting first charge).  Plaintiff also received another 21 additional bank statements reflecting the $12 charge.  Appx. at 63-85 (compilation of relevant pages of Plaintiff's bank statements).

Notwithstanding Plaintiff's claim that he was unaware of his membership for nearly two years, he logged onto the program's member website ***three times***.  *See* Appx. at 44 (Webloyalty site event detail report showing logins); Schueler Dec. ¶ 12.  On May 19, 2009, the same day that Plaintiff enrolled in Complete Savings, he logged into the member website via an email link.  Appx. at 44.  On May 3, 2010, nearly one year before Plaintiff claims he learned of his membership, Plaintiff logged onto the member website for a second time.  *Id.*  On November 9, 2010, approximately six months before Plaintiff claims he learned of his

- 4 -

membership, Plaintiff logged on for a third time.[1]  *Id.*

Additionally, in connection with Webloyalty's settlement of a 2009 consolidated class action, Plaintiff received notice by email on November 17, 2009 that he was enrolled in a Webloyalty membership program, he was being billed $12 a month for his membership, he could cancel at any time, and if he wanted to cancel, he could receive a full refund for his membership fees.  *See* Pinkerton Dec. ¶ 7-8.[2]  *See also* Appx. at 121 (email notice).

Notwithstanding that Plaintiff engaged in an enrollment process involving clear disclosures, was sent at least 27 emails concerning the Complete Savings program, received numerous bank statements clearly listing the monthly charge, and repeatedly logged onto member webpage, Plaintiff claims he only discovered his enrollment in April 2011.  He contacted Webloyalty to cancel his enrollment. On April 15, 2011, Webloyalty cancelled the membership and issued four refunds of monthly membership fees.  Appx. at 42 (cancellation email).  Webloyalty also sent Plaintiff a second email explaining that he could fill out an affidavit to request an additional refund.  Appx. at 41 (refund explanation email).  Plaintiff declined to complete and return this affidavit, despite understanding that it was the process to obtain a refund.  Appx. at 95-96 (Park Tr. 36:14-37:1).  Instead, he began working with class action attorneys.  Appx. at 95, 99 (Park Tr. at 36:8-13; 250:8-12).[3]

[1] Plaintiff's second and third logins occurred shortly after Webloyalty sent him emails concerning the program.  *See* Appx. at 44.  Thus, it appears that the emails prompted the logins, and that Plaintiff is lying about not receiving them.
[2] Webloyalty sent notices to consumers who enrolled after the settlement class period and before Webloyalty began requiring members to enter the last four digits of their credit card that they were enrolled in a membership program and offered them an opportunity for a full refund.  Notice was sent to over two million members.  Pinkerton Dec. ¶¶ 5-6.
[3] Plaintiff is a serial putative class representative in Plaintiff's counsel's cases.  He was also represented by the Patterson Law Group in *Park v. The Blue Buffalo Company, LTD*, U.S. District Court for the Southern District of California, Case No. 3:12cv01274 (settled in 2014) and is currently represented by A Martin Law in *Park v. Cole Haan, LLC*, U.S. District Court for the Southern District of

- 5 -

**B.    Putative Class Members' Varied Enrollment Experiences**

Although Plaintiff seeks to represent enrollees nationwide—and has the burden on this Motion—he offers no evidence concerning putative class members' enrollment experiences.  *See generally* Mot. (containing no such information); Appx. at 94 (Park Tr. 23:9-20 (testimony that Plaintiff has no information about the enrollment experiences of others)).  It is obvious why Plaintiff avoids doing so—it would spotlight the inherent variation of the enrollment process and need for individualized fact-finding that is antithetical to predominance.  For instance:

*Varied Programs:*  Webloyalty offered seven membership programs during the putative class period: Reservation Rewards, Complete Savings, Shopper Discounts & Rewards, Buyer Assurance, Travel Values Plus, Wallet Shield, and Distinctive Privileges.  Schueler Dec. ¶ 3.  Each offered different benefits.[4]  Additionally, within each program, there were various configurations of unique benefit packages offered to consumers, meaning that putative class members received dozens of different permutations of benefit packages.  *Id*. ¶ 5.

*Varied Enrollment Materials:*  The banners, enrollment pages, and acknowledgment pages presented to potential members changed dozens of times

---

California, Case No. 3:17-cv-01422.  Alisa Martin of A Martin Law was formerly associated with the Patterson Law Group.

[4] For example, Reservation Rewards and Complete Savings programs offered benefits such as printable coupons for dining and shopping attractions, discounts on movie tickets and gift cards for dining and shopping merchants, emergency roadside assistance, and trip delay insurance.  Shopper Discounts & Rewards and Buyer Assurance offered benefits including extended service protection on certain purchases (doubling product warranties), loss protection for certain purchases, and best price guarantees (members receive double the difference if the same merchant offers the same product for a lower price within 90 days).  The Travel Values Plus program provided online access to various travel-related discounts and protection benefits, including reduced rates at over 10,000 hotels, discount certificate for airfare purchases, and car rental discounts.  Wallet Shield provided credit monitoring and fraud protection services including a current credit report, credit monitoring, and identify theft insurance.  Distinctive Privileges included benefits aggregated from other Webloyalty programs and also additional unique benefits.

- 6 -

over the putative class period.  Appx. at 46-50 (a non-exhaustive compilation of banners) and 52-62 (a non-exhaustive compilation of Enrollment and Acknowledgment Pages).  Material differences are obvious.

For example, banners ceased using the words "award" or "reward" in favor of "incentive" or other like words, which further ensured that consumers understood that the incentive had not already been earned prior to enrollment. *Compare* Appx. at 46 and 47.  Webloyalty also added language stating that any coupon offer was an incentive for "join[ing a] service," and added "terms and conditions apply" to emphasize the acceptance involves obligations. *Compare* Appx. at 49 and 48, 50.

The Enrollment Pages over time added "see offer and billing details below" and removed language like "reward" or "award" in the picture of the coupon that appears on the Enrollment Page. *Compare* Appx. at 56 and 52.  Webloyalty also added a statement that the offer was from Webloyalty and not a third party or preferred partner of the merchant.  Appx. at 53.  Webloyalty also changed fonts and the size of the fonts, changed the placement of graphics, including the coupon graphic, bolded certain words and phrases, and moved the position of certain language (including the offer and billing details information). *See* exemplars in Appx. at 56-59.  Webloyalty also reduced copy related to benefits in its Acknowledgement Pages to reduce length and highlight the billing terms. *Compare* Appx. at 54 and 55.

***Varied Information Required to Complete Enrollment:***  Webloyalty employed a variety of enrollment processes during the putative class period, depending on the arrangement with a given retailer partner like Gamestop.  Some retailers selected a model in which customers would re-enter the full sixteen digits of their credit or debit card.  Others used the datapass model.  And some retailers chose a hybrid model in which enrolling customers were asked whether they would

- 7 -

like to enter their full account information *or* have the retailer transfer it to Webloyalty for convenience.  Schueler Dec. ¶ 4.

Within the datapass model, there was also significant variation.  Between September 30, 2008 and August 2009, consumers enrolled by entering their email address twice before clicking "YES!" underneath a disclosure making clear that doing so signified their agreement to the offer and billing details Webloyalty disclosed and authorization for a retailer to electronically transfer their credit or debit care information to Webloyalty.  *See* Appx. at 60.  In August 2009, Webloyalty changed the enrollment process to also require customers to enter the last 4 digits of their credit or debit card number, again underneath a disclosure making clear that doing so signified the customer's agreement to the offer and billing details and authorization for the retailer to electronically transfer their credit or debit card to Webloyalty.  Appx. at 52, 53.   By January 2010, Webloyalty ceased using datapass altogether and collected full billing information directly from all enrolling customers.  Mot. at 1 (citing cession of datapass usage).  Further, at any time, customers were free to contact Webloyalty to cancel their subscriptions or change their payment information when, for example, their credit card expired or changed for some other reason.  Schueler Dec. ¶ 10.

***Varied Email Communications:***  Webloyalty's email communications also changed throughout the putative class period—in substance and frequency.  For example, Webloyalty added instructions at the top of all emails for members to add the service address to their address book to ensure email deliverability.  *Id.* ¶ 8. Webloyalty changed the subject in the initial join email to highlight that billing terms are included with the membership.  *Id.*

At different times in the putative class period, Webloyalty members received either one or two emails on the date of their enrollment: (1) a "Membership Kit" containing profile information, a copy of the offer and billing details on the Enrollment Page with the addition of the last 4 digits of the card to be billed at the

- 8 -

end of the free trial, and a summary of program benefits, and (2) an email confirming membership in the Program and containing information on how to use the promotional coupon code that appeared on the enrollment page. *Id.* ¶ 9. Exemplars are Appx. at 2-5. Webloyalty also began emailing members who enrolled using a 30-day free trial program a notice to inform them when their free trial was about to expire and membership fees would begin. *See* Appx. at 10-11.

**Varied Mental States:**  it is obvious that the mental state of each member (*e.g.*, whether she intentionally, negligently, or otherwise joined a program) is individualized and requires one-by-one fact-finding. Although Plaintiff's thesis is that members joined unknowingly, *millions* of enrollees took actions clearly demonstrating their awareness of their memberships, such as engaging in activities on Webloyalty's website or utilizing member benefits. Webloyalty is unable to track all benefits usage, but the Smith Declaration submitted herewith recites statistics showing substantial, but under-representative, benefits usage.[5]

### C.    This Litigation

On June 7, 2012, Plaintiff sued alleging violations of the Retail Online Shoppers' Confidence Act ("ROSCA"), California's Business and Profession Code § 17200 ("UCL"), and the Connecticut Unfair Trade Practices Act ("CUTPA"). Plaintiff defined a putative class of consumers whose debit or credit cards were charged on or after December 29, 2010 in violation of ROSCA. On September 30, 2013, Plaintiff amended his complaint to include seven additional claims, including conversion. Plaintiff brought the amended complaint on behalf of an entirely new putative class—individuals whose debit or credit cards were charged on or after October 1, 2008. Plaintiff filed a second amended complaint on

---

[5] Webloyalty tracked five benefits offered on an individual basis and some of its third-party vendors tracked additional benefits. Smith Dec. ¶ 3, 10. Webloyalty also offered benefits that were not tracked. *Id.* ¶ 10. Thus, the usage statistics in Mr. Smith's Declaration understate actual usage of benefits.

- 9 -

October 3, 2013 adding violations of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693. On September 29, 2014, this Court dismissed the second amended complaint, but allowed Plaintiff to seek leave to amend. After reviewing the proposed third amended complaint, the Court dismissed the action on June 22, 2015. Plaintiff appealed. On March 28, 2017, the Ninth Circuit remanded, affirming dismissal of some claims and reinstating others. *Park v. Webloyalty.com, Inc*., 685 F. App'x 589 (9th Cir. 2017) (No. 15-56079) (the "Remand Order"). Plaintiff now seeks to certify a class under three of those remaining claims: the EFTA, conversion, and UCL.

## III.   ARGUMENT

Rule 23 is not "a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, Plaintiff must "prove … that [the proposed class] *in fact*" satisfies Rule 23. *Id*. The "rigorous analysis" required "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351. Here, the Court should deny the Motion because predominance is lacking. In the alternative, the Court should exclude from the class definition all persons who received full refunds and/or gave releases.

### A.   Plaintiff Has Not Proven Predominance

Rule 23(b)(3) requires Plaintiff to prove that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). Here, predominance is lacking because: (i) the EFTA authorization claim turns on individualized issues of intent; (ii) the conversion claim turns on the same individualized issues of intent; (iii) the UCL claim raises individualized issues concerning the enrollment process, and (iv) the statute of limitations raises additional individualized issues.

### 1.    The EFTA Authorization Claim Presents Individualized Issues

Predominance is lacking as to the EFTA claim that Webloyalty engaged in unauthorized funds transfers because the viability of each putative class member's claim turns on her subjective intent at the time of enrollment.  This is clear from the Ninth Circuit Order in this case, which instructs the court to assess whether each claimant granted authorization to debit their account "***either intentionally, or by negligently allowing Webloyalty to believe that it possessed such authority.***"  Remand Order at 591 (emphasis added).  This holding—which under the mandate rule is immune from revision or challenge in this Court[6]—confirms that the EFTA claim turns on what each enrollee subjectively intended.  Someone who intentionally or negligently authorized a funds transfer could not, under the Remand Order, maintain a claim.  *See* Remand Order at 591; *L.S. v. Webloyalty.com, Inc*., 673 F. App'x 100, 106 (2d Cir. 2016) (summary order) (affirming dismissal of EFTA claim because plaintiff authorized Webloyalty to charge his debit card); *Bott v. Vistaprint USA Inc*., 392 F. App'x 327, 327-28 (5th Cir. 2010) (dismissing EFTA claim based on finding of actual authorization); *Berry v. Webloyalty, Inc.*, No. 10-cv-1358-H, 2011 WL 1375665, at *7 (S.D. Cal. Apr. 11, 2011) (dismissing EFTA claim holding that Berry's email signature constituted authorization given the various "clear and readily understandable" disclosures on the Enrollment Page), *vacated on other grounds*, 517 F. App'x 581 (9th Cir. 2013), cert. denied 571 U.S. 1071; *Hook v. Intelius, Inc*., No. 5:10-cv-239, 2011 WL 1196305, at *8 (M.D. Ga. Mar. 28, 2011) (dismissing EFTA claim because plaintiff had authorized charges).

A claim that turns on subjective intent raises difficult individualized issues and thus lacks predominance.  *See, e.g., Connelly v. Hilton Grand Vacations Co*.,

---

[6] *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) ("A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it.")

294 F.R.D. 574, 578 (S.D. Cal. 2013) (predominance lacking where individual questions of consent at issue); *Vondersaar v. Starbucks Corp.*, 719 F. App'x 657, 659 (9th Cir. 2018) (refusing to certify class where, among other inquiries, whether each class member "presented himself with the intent of purchasing a product" predominated); *Roz v. Nestle Waters N. Am., Inc.*, No. 2:16-cv-04418-SVW-JEM, 2017 WL 6942657, at *5 (C.D. Cal. Sept. 13, 2017) (denying certification because "whether each customer provided affirmative consent to a recurring credit card charge" cannot be analyzed on a class-wide basis); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (denying certification because "claims that 'require[ ] proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on those statements to his detriment' are not susceptible to class-wide treatment") (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998)).

Here, for instance, this Court would need to conduct one-by-one factfinding as to what each putative class member understood and intended at the time of enrollment. This would include, for instance, examining members' email correspondence and bank statements, checking whether they logged onto Webloyalty's benefits website, gathering whatever memories are available via deposition or otherwise, and analyzing usage of benefits, just to name a few steps.[7]

While some putative class members might assert unawareness of their memberships, that would only heighten the need for individualized adjudication. Plaintiff's own contested assertion of unawareness of his membership, for instance, requires evaluation of his idiosyncratic assertion that he somehow ignored: (i) the Enrollment Page and its prominent disclosures; (ii) the Acknowledgment Page

---

[7] Plaintiff misses the point by framing the question as whether a handful of enrollment "methods" equate to authorization. Mot. at 6. As the Ninth Circuit explained, the issue is the intent of each enrollee—it may be that two enrollees used the same enrollment "method" but one did so knowingly and one unwittingly.

- 12 -

presented immediately after enrollment; (iii) two emails sent to him the same day describing the enrollment; (iv) 25 subsequent emails concerning the Program; (v) a special notice sent to out-of-class members after Webloyalty's 2009 settlement of a consolidated class action ("MDL Settlement"); and (v) bank statements repeatedly reflecting the charge. Further, that Plaintiff logged onto Webloyalty's website *three times* calls into question any assertion of unawareness of the membership. If Plaintiff ignores the weight of this evidence and disagrees, it will not matter. The point is not for the Court to resolve this issue today—it is that the issue is individualized, complicated, and will recur *for each putative class member.*

Moreover, even if an enrollee was genuinely unaware of her membership, the Remand Order holds that acting negligently to enroll constitutes authorization. Remand Order at 591. Thus, individualized fact-finding must also examine the objective actions taken by each enrollee that could have manifested a grant of authority for a funds transfer.

Finally, the lack of predominance is not the only legal problem presented by a claim that turns on the existence of authorization—there is a related standing problem. Under Ninth Circuit precedent, a certified class must *not* include persons who lack standing. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("[N]o class may be certified that contains members lacking Article III standing" (alterations in original) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 20016)); *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (class may not be "defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct") (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012))). Someone who intended to enroll and authorized the funds transfers has not been harmed by an unauthorized funds transfer, and therefore lacks standing. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1026–27 (9th Cir. 2011) ("[I]f a plaintiff fully intended to purchase

- 13 -

merchandise or a service and to use a debit card, but the merchant or other seller obtained the transfer from the plaintiff's account without first obtaining a proper authorization, the plaintiff will, most likely, find it difficult or impossible to show actual damages."), *abrogated on other grounds by Comcast Corp. v Behrend*, 569 U.S. 27 (2013).  Stated another way, someone who wanted the rewards program and knowingly and voluntarily agreed to the terms is not a claimant, they are a customer.  Plaintiff may not permissibly define a class that includes persons who lack standing and, plainly, that is so for many putative class members.

Thus, common questions of fact do not predominate as to the EFTA authorization claim.[8]

## 2. The Conversion Claim Presents Individualized Issues

Predominance is lacking as to conversion because it also turns on whether each enrollee authorized the funds transfer, and thus raises the same individualized issue of subjective intent as the EFTA authorization claim.  Controlling law is clear: "[a] plaintiff in a conversion action must . . . prove ***that it did not consent*** to the defendant's exercise of dominion" over the alleged converted property.  *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir. 2008) (emphasis added); *Farrington v. A. Teichert & Son, Inc.*, 59 Cal. App. 2d 468, 474 (Ct. App. 1943) ("[T]here can be no conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property.").  Thus, this Court will need to examine—on a one by one basis—whether each putative class member intentionally enrolled in a rewards program and consented to the funds transfer.  As detailed above, that need for that individualized inquiry defeats predominance.[9]

---

[8] Plaintiff's related EFTA claim that Webloyalty failed to supply a "copy" of the authorization fails due to individualized issues raised by the statute of limitations, discussed below.

[9] This case is nothing like *Winkler v. DTE, Inc.*, 205 F.R.D. 235 (D. Ariz. 2001) (cited Mot. at 8), where plaintiffs asserted a conversion claim against a car dealership for overcharging consumers for "Official Fees."  The court found a

- 14 -

### 3.   The UCL Claim Presents Individualized Issues

The UCL claim also fails to meet Rule 23(b)(3) standards.

***First,*** to the extent Plaintiff's UCL unlawfulness claim relies on a predicate EFTA claim (Mot. at 8-9), the Court should deny certification for the same reasons set forth herein as to why the EFTA claim lacks predominance (*i.e.,* due to the existence of individualized issues concerning authorization and application of the statute of limitations).

***Second*,** Plaintiff also cannot certify the UCL unlawfulness claim predicated on a violation of ROSCA, which asserts that, if Webloyalty obtained payment information from a member via datapass prior to the enactment of ROSCA, it could not keep using that information for billing post ROSCA.  Plaintiff overlooks that, as detailed above, members were free at any time to update their payment information.  Thus, for instance, even if someone's initial enrollment involved the collection of billing information via datapass, she could at any time have directly supplied new payment information.  However, determining that requires individualized fact finding.

Further, even to the extent the ROSCA claim avoids some (but not all) of the individualized issues that plague other claims discussed herein (*e.g.,* statute of limitations, authorization)—which Plaintiff no doubt will argue supports certifying the claim—superiority is lacking where only one of a number of claims could potentially be certified, leaving the rest to be asserted individually.  *See Colman v. Theranos, Inc*., --- F.R.D. ---, No. 16-cv-06822-NC, 2018 WL 2463097, at *17 (N.D. Cal. May 31, 2018) ("[T]he marginal efficiencies of class treatment on this sliver of Plaintiffs' case do not surmount the lingering uncertainties in managing the proposed class.").

---

common question as to whether the charge was in accordance with the standard sales contract.  *Id*. at 240.  The claim raised no individualized consent issues.

- 15 -

***Finally,*** individualized issues predominate in the UCL unfairness claim because it is premised on the notion that the enrollment process is unfair, and that process varied.  Plaintiff may not sweep away individual issues by framing the question as whether using datapass is unfair (Mot. at 9).  Courts have made clear that datapass is *not* per se unfair.  *See Williams v. Affinion Grp., LLC*, 889 F.3d 116, 125 (2d Cir. 2018) ("[T]he transfer of billing information from one merchant to another is not inherently fraudulent."), aff'g *In re Trilegiant Corp.*, 11 F. Supp. 3d 82, 120 (D. Conn. 2014) (dismissing unfairness claim and stating, "[d]atapass can be used in a fair manner to help consumers efficiently complete several online purchases.").  Thus, the unfairness inquiry necessarily depends on the varied *facts and circumstances* of the use of the challenged practice.  *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014) (affirming dismissal of UCL class claims where class members were exposed to different contracts, in-store signage, and oral communications which required individual inquiry to determine whether each was exposed to an alleged misrepresentation), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017); *Roz,* 2017 WL 6942657, at *5 (denying certification because "individual issues of notice, representation, and consent exist" in UCL class action where varying representations made to class members); *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, No. CV 14-7242-DMG, 2016 WL 5920345, at *7 (C.D. Cal. June 23, 2016) (denying certification of UCL claim where "lack of uniformity" in product packaging and advertising because "consumers' understanding of the alleged misrepresentation would not be uniform").

Here, as detailed above, the enrollment process varied tremendously over time and from customer-to-customer.  Plaintiff himself argued on appeal to the Ninth Circuit that the enrollment process was a dynamic one and that the Court should not rely on the Enrollment Page alone but should consider "why and how [Plaintiff] got to the enrollment page in the first place."  *See* Appx. at 107 (relevant

- 16 -

page of Appellant's Opening Brief filed in *Park v. Webloyalty.com, Inc.,* 685 F. App'x 589 (9th Cir. 2017) (No. 15-56079)).  If the Court must consider Plaintiff's entire enrollment process to make a fairness determination for him, it must do the same for every single putative class member.  There were not only many different programs, banners, enrollment pages, and versions of post-enrollment communications, but there were many more combinations of these pages and communications.  And they manifest in materially different enrollment experiences.

To begin with, there were material differences in how the offer and program information were presented.  Some examples:

- Between October 2008 and February 2009, consumers completing purchases through Webloyalty partner FTD.com were presented with banners that informed them "By clicking [the "continue" button] above, you can claim your incentive from our preferred partner, See Details."  However, banners for Allegiant Air between March 2009 and July 2009 informed consumers that "by clicking above, you can claim your incentive from our preferred partner *when you join their service*" and that "*terms and conditions apply*" (emphasis added).  *Compare* Appx. at 48, 49, and 50.

- Between October 2008 and February 2009, an Enrollment Page for Webloyalty partner Fandango referred to the offered benefit as an "Award."  However, Fandango Enrollment Pages between August 2009 and January 2010 informed consumers they would receive an "Incentive" for "sign[ing] up".  *Compare* Appx. at 52 and 60.

- Fandango Enrollment Pages presented between August 2009 and January 2010 invited consumers to "See Offer and Billing Details Below" whereas consumers enrolling via Drugstore.com between

- 17 -

October 2008 and February 2009 may not have seen this language. *Compare* Appx. at 52 and 61.

- Fandango Enrollment Pages between October 2008 and February 2009 asked consumers to enter their email address twice and click a "Yes" confirmation button to enroll in a program, whereas consumers enrolling between August 2009 and January 2010 were asked to enter their email address twice and the last four digits of their credit card and also click the "Yes" confirmation button. *Compare* Appx. at 52 and 60.

- Consumers enrolling between March 2009 and July 2009 after completing purchases through TicketWeb may have enrolled with a hybrid model through which they *chose* to have their billing information transferred to Webloyalty rather than entering it again. *See* exemplar at Appx. at 62.

- Consumers who enrolled in Reservation Rewards between August 2009 and January 2010 through AllPosters were presented with less copy on their Acknowledgment Pages than consumers who enrolled in Shoppers Discounts & Rewards between October 2008 and February 2009 – a change Webloyalty made to reduce length and further ensure members understood the billing terms of their memberships. *Compare* Appx. at 54 and 55.

Given these and other variations, the only way to adjudicate the fairness of each enrollment is to review the facts and circumstances of each one.

### 4. The Statute of Limitations Raises Additional Individualized Issues As to All Claims

The statute of limitations supplies an additional basis on which this Court should deny certification. Every single putative class member enrolled outside of the limitations period and has funds transfers that fall outside of the statutes of

- 18 -

limitations.  Thus, the putative classes are composed entirely of individuals whose claims are time-barred unless they can invoke the discovery rule—a highly individualized inquiry that is antithetical to predominance.

The legal framework is well-settled.  Courts will not define classes to include persons whose claims are time-barred.  *See Perez v. First Am. Title Ins. Co.*, No. CV-08-1184-PHX-DGC, 2010 WL 1507012, at *2 (D. Ariz. Apr. 14, 2010) ("A Rule 23 class action cannot proceed on behalf of class members whose claims are time-barred." (internal quotation marks omitted)); *Lopez v. G.A.T. Airline Ground Support, Inc.*, No. 09cv2268-IEG, 2010 WL 3633177, at *14 (S.D. Cal. Sept. 13, 2010) (limiting certification of the class to those whose claims were not time-barred).  Similarly, predominance is lacking where establishing timeliness would require putative class members to invoke the discovery rule, which necessitates individualized inquiry into the facts and circumstances of notice of the claim.  *See Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 969, 971 (S.D. Cal. 2016) (denying certification where statute of limitation resolution required individualized inquiries under the discovery rule, which is "not susceptible to generalized proof"); *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1152-53 (N.D. Cal. 2010) (application of discovery rule leads to "an individualized inquiry as to each class member's individual circumstances"); and *Perez*, 2010 WL 1507012, at *5 ("[I]ndividual issues would predominate over common issues because a plaintiff-by-plaintiff inquiry would be required to determine when a plaintiff's claim arose under the discovery rule").  These principles apply to each claim that Plaintiff seeks to certify.

**EFTA Claim:**  The EFTA has a one-year limitations period that accrues on the first date of any recurring charge.  *See* 15 U.S.C. § 1693m(g); *Wike v. Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009) (EFTA's one-year limitations period begins "when the first recurring transfer took place"); *Harvey v. Google, Inc.*, No. 15-CV-03590-EMC, 2015 WL 9268125, at *3 (N.D. Cal. Dec. 21, 2015) ("[T]he first

- 19 -

recurring transfer not only triggers the one year limitations period as to that transfer, but it also triggers the limitations period for all ensuing transfers."); *Pelletier v. Pac. WebWorks, Inc.*, No. CIV S-09-3503 KJM, 2012 WL 43281, at *6 (E.D. Cal. Jan. 9, 2012) ("EFTA's one-year statute of limitations . . . begins to run when the first recurring transfer takes place.").

Webloyalty ceased using datapass in January 2010, so the latest a recurring charge based on datapass could have been initiated for any putative class member was February 2010.  However, Plaintiff did not sue until June 7, 2012, and did not add an EFTA claim until October 3, 2013.  Thus, the one-year period ran for all putative class members prior to suit.  As a result, each putative class member's claim is facially time-barred, and they must each invoke the discovery rule to attempt to state a timely claim.  However, doing so would raise a host of individualized issues, such as determining the state of mind of each enrollee, what occurred during the enrollment process, whether bank statements disclosed the charges, and what was contained in post-enrollment emails, just to name a few issues.

Park's own facts spotlight the idiosyncratic nature of the discovery rule.  He enrolled in May 2009 and did not assert an EFTA claim until October 2013.  His claim is facially time-barred, and he thus argues lack of notice.  However, his ability to invoke the discovery rule will turn on an adjudication of individualized issues such as (i) whether the disclosures that he received during his enrollment put him on notice of the funds transfers; (ii) whether the two emails received the same day provided notice; (iii) whether the 25 emails that Webloyalty sent him thereafter (which he denies receiving) provided notice; (iv) whether the information was available to Plaintiff through online banking, which he used; (v) whether the bank statements he received in the mail put him on notice; (vi) whether the additional notice and refund offer he received on November 17, 2009 as part of the MDL settlement put him on notice; and (vii) whether he is lying

- 20 -

about his unawareness of his membership, given for instance that he logged onto Webloyalty's website three times during the period that he should not, by his account, even have understood that Webloyalty existed.  Indeed, the very fact that prior to suit he turned down multiple refund offers and decided instead to work with class action lawyers—something he has done repeatedly against other companies—suggests a motive to gin up litigation, rather than any genuine unawareness of his membership.

Plaintiff has previously argued that the statute of limitations did not run because a different class plaintiff asserted similar claims in *Berry*, 2011 WL 1375665, tolling the statute of limitations under *American Pipe*.  The Supreme Court has recently confirmed, however, that *American Pipe* tolling does not apply to follow on class actions.  *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018) ("*American Pipe* tolls the statute of limitations during the pendency of a putative class action, allowing unnamed class members to join the action individually or file individual claims if the class fails.  But *American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations.").[10]

Each putative class member's facts concerning notice will vary, and no common adjudication is possible.  Thus, predominance is lacking as to the EFTA claim due to the individualized issues presented by the statute of limitations.

*Conversion:*  The timeline with respect to the conversion claim is more complex, but the result is the same—all putative class members have time-barred funds transfers and must invoke the discovery rule to recover.  Conversion has a

---

[10]  When the time comes to address Plaintiff's individual claim, *American Pipe* will provide him no refuge.  The detailed disclosures he received at enrollment and the early days after enrolling plus his access to online banking put Plaintiff on notice well before the filing of *Berry*.  *See Park v. Webloyalty.com, Inc.*, No. 12CV1380-LAB, 2014 WL 4829465, at *5-6 (S.D. Cal. Sept. 29, 2014) (Dkt. 37) (finding that Plaintiff's EFTA claim accrued when he had reason to know the basis of his claim).

- 21 -

three-year statute of limitations.  Cal. Code Civ. Proc. § 338(c); *see Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1200 (2013).  The relevant timeline is as follows:

- June 7, 2012:  Plaintiff files the original complaint, which seeks to assert a class focusing on the period after ROSCA was enacted and does not assert a conversion claim.

- September 30, 2013:  Plaintiff adds a conversion claim to his First Amended Complaint and expands the putative class to the period before ROSCA was enacted.[11]

- June 22, 2015:  this Court dismisses the case; statute of limitations tolling for members of the putative class ceases during the appeal.[12]

---

[11] The conversion claim does not relate back to the original complaint.  To relate back, a claim must arise "out of the conduct, transaction, or occurrence" set out in the original complaint (Fed. R. Civ. P. 15(c)(1)(B)), and the complaints must "share a common evidentiary base."  *Markus v. Gschwend (In re Markus)*, 313 F.3d 1146, 1151 (9th Cir. 2002).  The original complaint focused on a purported failure to comply with ROSCA, defined a proposed class of class of persons charged on or after December 29, 2010, and raised the issue of whether payment information obtained via datapass remained usable after ROSCA.  Dkt. No. 1.  The conversion claim defines a class earlier in time and depends on whether each customer consented to a funds transfer.  The conversion claim thus raises "a new legal theory depending on different facts" that does not relate back.  *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008).

[12] *See In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, No. 2:11- CV-07166-MRP, 2012 WL 1097244, at *4 (C.D. Cal. Mar. 9, 2012) (upon dismissal, tolling ceased, and when Court of Appeals reinstated the claim, tolling resumed, but "[i]n the meantime, there was neither any pending putative class action nor any reasonable basis for [an absent class member] to believe that its claims were being tolled."); *Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 117, 119 (2d Cir. 2013) (upon dismissal, tolling ceased and did not continue during pendency of motion for reconsideration or appeal); *Armstrong v. Martin Marietta Corp*, 138 F.3d 1374, 1388 (11th Cir. 1998) ("[C]ontinuing to toll the statute of limitations . . . through the entire appeals process would seriously contravene the policies underlying statutes of limitations.");  *In re Vertrue Inc. Mktg. & Sales Practices Litig.*, 719 F.3d 474, 480 (6th Cir. 2013) (holding that putative class action tolled statute of limitations for putative class members until the district court dismissed the action and stated dismissal "foreclosed the possibility that any decision on the certification issue would be forthcoming.");  *Sawyer v. Atlas Heating & Sheet*

- 22 -

1
2
3
4

- March 28, 2017:  Ninth Circuit remand.  The statute of limitations has run for 21 months, meaning that only claims accruing on or after June 30, 2012 (*i.e.,* 15 months prior to the filing of the First Amended Complaint) fall within the statute of limitations.

5
6
7
8
9
10
11
12
13

Thus, funds transfers prior to June 30, 2012 fall outside of the statute of limitations.  However, Webloyalty ceased using datapass in January 2010, which is thus the latest that a putative class member could have enrolled.  *See* Mot. at 5 (defining all proposed classes to include only those that enrolled without directly supplying payment information).  Therefore, each putative class member enrolled outside of the limitations period and has at least two plus years' worth of fund transfers outside of the limitations period.  They must attempt to invoke the discovery rule.  However, as detailed above, common issues do not predominate where putative class members must invoke the discovery rule.

14
15
16

*UCL*:  The UCL has a four-year statute of limitations.  Cal. Bus. & Prof. Code § 17208.  *See Aryeh*, 55 Cal. 4th at 1200.  Plaintiff asserted the UCL claims on behalf of the class in the original complaint on June 7, 2012.  As detailed above,

17
18
19
20
21
22
23
24
25
26
27
28

*Metal Works, Inc.*, 642 F. 3d 560, 563 (7th Cir. 2011) ("Tolling lasts from the day a class claim is asserted until the day the suit is conclusively not a class action— which may be because the judge rules adversely to the plaintiff . . . ."); *Collins v. Vill. of Palatine*, 875 F.3d 839, 841 (7th Cir. 2017) ("Tolling stops immediately when a class-action suit is dismissed—with or without prejudice—before the class is certified."); *Henson v. Fidelity Nat'l Fin. Inc.*, No. 2:14-cv-01240-DDW, 2014 WL 1246222, at *5 (C.D. Cal. Mar. 21, 2014) (dismissal "strips the action of its putative class-action status . . . The pendency of the appeal— without more—does not affect the statute of limitations with respect to putative class members"); *In re Wellpoint, Inc., Out of Network UCR Rates Litig.*, No. ML 9-2074, 2016 WL 6645789, at * 11 (C.D. Cal. July 19, 2016) (statute of limitations period not tolled after motion for class certification denied and all of the claims were dismissed a year later); *Shak v. JPMorgan Chase & Co*., 156 F. Supp. 3d 462, 478 (S.D.N.Y. 2016)("[i]t is well settled that dismissal of all class claims in a suit terminates tolling and causes the limitations period for each absent class member to resume running" (internal quotation marks omitted)); and *Scott v. District of Columbia*, 87 F. Supp. 3d 291, 295–96 (D.D.C. 2015) (dismissal of all class claims in a suit terminates tolling and causes the limitations period for each absent class member to resume running).

- 23 -

the statute of limitations ran against putative class members for 21 months following the dismissal order.  Thus, the UCL claims are time-barred prior to March 7, 2010.  Once again, all putative class members enrolled and have funds transfers outside of the limitations periods, meaning that all putative class members must invoke the discovery rule.

Thus, based on the statute of limitations, the Court should find predominance lacking as to all claims.

### B.  In the Alternative, Any Class Must Exclude People Who Gave Releases Or Received Full Refunds

In the alternative, the Court should narrow any certified class in two respects.

*First*, the Court should exclude those who gave releases, because the presence of released class members presents a basis for the denial of certification.  *See Javine v. San Luis Ambulance Serv., Inc.*, No. CV 13-07480, 2015 WL 12672090, at *9 (C.D. Cal. Jan. 13, 2015) (denying certification where some putative class members had released claims); *cf. Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C 08-03894, 2011 WL 3476473, at *2-*3 (N.D. Cal. Aug. 9, 2011) (class treatment not superior where some putative members were bound by arbitration clauses); *Lim v. Helio*, *LLC*, No. CV 11-9183, 2012 WL 12884439, at *1 (C.D. Cal. Apr. 18, 2012) (similar).

In July 2009, Webloyalty settled a consolidated class action, *In re Webloyalty.com, Inc. Marketing and Sales Practices*, MDL No. 07-01820 (D. Mass.).  The settlement class included all consumers who enrolled in *or* were members of Webloyalty's programs from September 11, 2000 through September 30, 2008.  *See* Appx. at 111 (MDL Final Judgment ¶ 3).  Webloyalty sent out over twenty million court-approved email notices to class members.  *See* Pinkerton Dec. ¶ 4.  *See also* Appx. at 118-119 (email notice sent to class members).  All such individuals have released Webloyalty from all known and unknown claims.  *See*

Appx. at 118-119.  However, here, the proposed class definitions capture anyone who was charged after September 30, 2008—a definition that inevitably includes members of the settlement class who remained members of a Webloyalty program after September 30, 2008.

There were other releasors as well.  In October 2013, Webloyalty entered into a multi-state settlement with 49 attorneys general, including the California Attorney General, pursuant to which members in their states were offered the choice of a full refund.  Those who submitted a claim gave a release.  *See* Appx. at 168-172 (copy of notices and claim form attached to Final Judgment filed in *People of the State of California v. Affinion Group*, No. BC-524092, Superior Court for the State of California, Los Angeles County (Oct. 21, 2013)).[13]

*Second*, the Court should exclude from any certified class persons who received full refunds because such persons lack standing, and classes must exclude persons lacking standing.  *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (citing *Denney v. Deutsche Bank AG,* 443 F.3d 253, 264 (2d Cir. 2006)).  Someone who received a full refund lacks injury and therefore standing. *See Berry v. Webloyalty*, 517 F. App'x 581, 582 (9th Cir. 2013) (affirming dismissal, holding that because plaintiff had been fully refunded for his membership fees, he had alleged no injury in fact to support Article III standing).

Thus, if the Court certifies any class, it should expressly exclude all persons who granted releases to Webloyalty and/or received full refunds.

## IV.   CONCLUSION

This Court should deny Plaintiff's Motion for Class Certification, or in the alternative define all classes expressly to exclude persons who granted releases to Webloyalty and/or received full refunds, or were members prior to September 30, 2008.

---

[13] Each attorney general filed its own final judgment.  Webloyalty here provides the judgment filed in California as Exhibit 14 of the Appendix.

- 25 -

Dated: August 20, 2018

Respectfully submitted,

WILMER CUTLER PICKERING HALE
AND DORR LLP

By: *John J. Butts*
John J. Butts (MA SBN: 643201)
*Admitted Pro Hac Vice*
Timothy Perla (MA SBN: 660447)
*Admitted Pro Hac Vice*
Jessica Lisak (MA SBN 680207)
*Admitted Pro Hac Vice*
Stephen N. Provazza (MA SBN: 691159)
*Admitted Pro Hac Vice*
Paloma Naderi (MA SBN: 696679)
*Admitted Pro Hac Vice*
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
Email: john.butts@wilmerhale.com
Email: timothy.perla@wilmerhale.com
Email: jessica.lisak@wilmerhale.com
Email: steven.provazza@wilmerhale.com
Email: paloma.naderi@wilmerhale.com

Christopher T. Casamassima
(CA SBN: 211280)
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Tel.: (213) 443-5374
Fax: (213) 443-5400
Email: chris.casamassima@wilmerhale.com

Attorneys for Defendant
WEBLOYALTY.COM, INC.

- 26 -

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 20th day of August 2018, the following document was electronically filed with the Clerk of Court using the CM/ECF system, which will send by email notification of to all parties of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System:

**1. Defendant Webloyalty.com, Inc.'s Opposition to Plaintiff's Motion for Class Certification**

Dated:  August 20, 2018           */s/ Timothy Perla*

Attorney for Defendant,
Webloyalty.com, Inc.
timothy.perla@wilmerhale.com