UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN PARK,<br><br>                     Plaintiff,<br><br>v.<br><br>WEBLOYALTY.COM, INC., et al.,<br><br>                   Defendant. | Case No.:  12cv1380-LAB (LL)<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION** |

On May 19, 2009, Plaintiff Kevin Park purchased a gift certificate online for his son from Gamestop.com. After entering his credit card information, Park saw an offer for a coupon to save on his next Gamestop purchase. He clicked on the offer, and was directed to a new window. He says he did not realize he had been directed away from the Gamestop website to a new website. This new window provided the details of the coupon offer and explained that by providing an email address the customer would be agreeing to a subscription to a membership-fee based program known as Complete Savings. Park says he did not look for and did not see these disclosures, and did not intend to sign up for a membership program.

The enrollment page asked him to provide his email address twice and click an acceptance button. By clicking this acceptance button, Park subscribed to a fee-based membership program known as Complete Savings, operated by

Webloyalty. Park never re-entered his billing information for this subscription; rather, the data was shared by a method known as "data pass," which allowed Webloyalty to obtain his billing information directly from Gamestop.com. Park says that he was not aware that he had been redirected away from the website Gamestop.com.

The first charge by Webloyalty was made one month later, on June 19, 2009. Park says that in April of 2011 he discovered unauthorized charges to his bank account totaling $264, which were the charges made by Webloyalty. He requested a refund, and Webloyalty granted him only a partial refund of $48, for the four previous months.

Park has brought this putative class action, with the putative class consisting of all persons who did not directly provide their billing information to Webloyalty, but who were charged for a subscription-based program at any time since December 29, 2010. A different putative class action, *Berry v. Webloyalty.com, Inc.*, 10cv1358-H (CAB) was filed in this District on June 25, 2010, and Park says he was a member of the putative class in that case. The *Berry* decision was vacated on appeal, because although Webloyalty had debited the plaintiff's bank account, it had later given him a full refund, resulting in his lacking a cognizable injury. *Berry v. Webloyalty.com, Inc.*, 517 Fed. Appx. 581 (9th Cir. 2013). This deprived him of standing, and the court of jurisdiction. *Id.* at 582.

The third amended complaint ("TAC") brings claims under the federal Electronic Funds Transfer Act (EFTA), California's Unfair Business Practices Act, Connecticut's Unfair Trade Practices Act, and four state law causes of action based on various theories of conversion. The state and federal unfair trade practices claims are each divided into two claims, based on different theories, and are to be brought by different putative classes. Under one theory, Webloyalty's practices of charging consumers' credit or debit cards without obtaining expressed informed consent, and of using information obtained through the "data pass"

process are unfair. Under the second theory, Webloyalty's practices are unfair because they violate the Restore Online Shoppers' Confidence Act (ROSCA). Claims based on alleged violations of ROSCA were brought in the name of a nationwide post-ROSCA class (based on Connecticut's unfair trade practices law) and a California post-ROSCA class (based on California's unfair trade practices law).

Now before the Court is Park's motion to certify this as a class action. The Court received briefing and held a hearing, and is now prepared to rule.

## I.   Proposed Classes

The TAC proposed to certify a nationwide class consisting of four classes: Class A, the Nationwide Class; Class B, the California Class; Class C, the Nationwide Post-ROSCA class, and Class D, the California Post-ROSCA class. In his motion to certify, Park seeks certification of only three classes: a California Class, a California Post-ROSCA Class, and a nationwide Debit Card Class. This order refers to the classes as defined in the motion, not the TAC.

The classes consist of people who 1) did not directly provide their credit card or debit card number, address, or "contact information" to Webloyalty, who then 2) had their credit or debit card charged or their bank account debited by Webloyalty for either a Complete Savings membership or any other club membership maintained by Webloyalty at any time since October 1, 2008. The California Class includes "all persons residing in California"[1] who fit this definition. The California post-ROSCA class includes everyone in the California Class who were charged by Webloyalty for membership fees after the enactment of ROSCA on December 29, 2010. The Debit Card Class consists of a nationwide class of people who fit within

---

[1] Presumably this means all persons residing in California when they were enrolled or charged for a membership. The claims of people who moved to California only later cannot be governed by California law.

the general parameters of the class and who either had a debit card charged or a bank account debited. In its opposition, Webloyalty argued that parties who settled an earlier class action and signed a release, and people who received a full refund of membership fees should be excluded from the class definition. In his reply, Park agreed, but only as to people who had received a full refund of fees.

## II.    Procedural Posture and Law of the Case

A number of issues have already been decided in this case, either by this Court or by the Ninth Circuit panel.  The Court must of course accept the panel's decisions and treat them as binding. *See Snow-Erlin v. United States*, 470 F.3d 804, 807 (9th Cir. 2006) (holding that issues decided by an appellate court either explicitly or by necessary implication are law of the case). While the Court is free to reconsider its own decisions, it ordinarily will not do so except in unusual circumstances.  *See Pepper v. United States*, 562 U.S. 476, 506–07 (2011) (discussing law of the case doctrine). The Court dismissed Park's first and second amended complaints, the latter without leave to amend. Park then took an appeal. The Ninth Circuit affirmed in part, reversed in part, and vacated in part. *Park v. Webloyalty.com, Inc.*, 685 Fed. Appx. 589 (9th Cir. 2017).

The Court's dismissal of the second amended complaint was based, in part, on the fact that Park had received a refund for the last four months of his fees. The Court, relying on *Berry*, 517 Fed. Appx. at 581, instructed Park that his next amended complaint should omit claims to the extent they were based on the refunded charges.  *See Park v. Webloyalty.com, Inc.*, 2014 WL 4829465, at *7–*8 (S.D. Cal., Sept. 29, 2014) ("First Dismissal"). Instead of doing that, Park proffered a proposed third amended complaint that did not exclude any portions of the claims arising from the refunded money.  *See Park v. Webloyalty.com, Inc.*, 2015 WL 4560567, at *2 (S.D. Cal., June 22, 2015) ("Second Dismissal").  He instead alleged that he had been injured merely by being charged $48, in spite of the later refund. He reasoned that he had been deprived of interest on the money and of

the use of his money from the time the charges were made until the time it was refunded, about four months.[2] *See id.* The Court rejected this as inconsistent with the holding of *Berry*, where the plaintiff experienced the same temporary deprivation of his money. *See Berry*, 517 Fed. Appx. at 581.[3] Park sought, and continues to seek, damages based on the fact that the account from which the money was drawn was an interest-bearing account, and he lost the interest he would have earned on $48 over four months. (TAC, ¶ 20.) He also says he could have made profitable use of the $48 by paying off other outstanding debt. (*Id.*) The latter is necessarily a fallback argument, however; he could not have kept the money in his account, drawing interest, and also spent it to pay off debt. This is not enough to distinguish *Berry*, because those same issues were before the panel, which found them insufficient to confer standing.[4]

On appeal, however, the appellate panel in this case rejected the holding of *Berry*, and reversed the dismissal of Park's EFTA, ROSCA, and state law causes of action *in toto*. Because neither party had drawn the panel's attention to the refund issue and the jurisdictional problem, the Court itself sent a letter pointing it out, as provided by Ninth Circuit General Order 12.10. The letter was received and entered in the appellate docket. It pointed out that to the extent claims were based on refunded

---

[2] At argument on the motion for class certification, the parties agreed that the refund represented the last four months' charges, post-dating ROSCA's enactment in December of 2010. The parties agree he received the refund in April of 2011.

[3] Although *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193 (9th Cir. 2016) had not yet been decided, the argument also appears to be foreclosed by that decision. *See id.* at 1195 (holding that plaintiff bringing state-law consumer claims lacked Article III standing because the money she paid had been refunded).

[4] Berry also argued that he had standing because he lost interest on his $36 for a few months, and lost beneficial use of his money during that time. This contention was discussed at oral argument, and the panel rejected this argument.

charges, the holding of *Berry* would require dismissal. The panel made no changes to its order, however, and the mandate issued.

Following remand, Webloyalty moved to dismiss claims to the extent they were based on money that had been refunded to Park. The Court summarily denied the motion, explaining in a reasoned order why the panel's holding prevented it. (*See* Docket no. 71.) Without repeating that order in detail here, suffice it to say that the issue of jurisdiction was squarely before the panel, which of course also knew its obligation to consider and resolve jurisdictional questions. The panel knew Park had conceded that some of the charges had been refunded, and that this Court had determined that claims arising from those charges were moot. The panel nevertheless, making no distinction between claims based on refunded and unrefunded charges, held that these claims should not have been dismissed at all. The necessary implication of this decision is that claims arising from refunded charges were not moot, and that Park has standing to raise those claims. *See Snow-Erlin*, 470 F.3d at 807. In sum, the *Park* panel rejected the holding of *Berry*. For purposes of this case at least, the Court must treat *Berry* as having been repudiated and no longer good law.

What is less clear is whether the panel's decision meant that Park had plausibly alleged secondary injury flowing from the charges (*i.e.*, lost interest and loss of beneficial use of the money), or whether the charges themselves are sufficient to confer standing. The only statutory damages he sought were in connection with his EFTA claim on behalf of himself and a class of customers whose debit cards were charged. (TAC, ¶53.) But the claims for unjust enrichment, money had and received, and California and Connecticut unfair trade practices statutes seek disgorgement of unlawfully held funds. To be sure, the Court can order disgorgement of funds not yet refunded. But the TAC seeks a refund of the entire amount Webloyalty withdrew from Park's account, and he refused to amend his complaint to exclude requests for relief to the extent they are

based on money already refunded to him. It is difficult to see how Park has standing to seek an order requiring Webloyalty to refund money it already refunded. But with regard to Park's ROSCA-based claim, Webloyalty refunded him the entire amount it charged him after the enactment of ROSCA. The Court previously held that ROSCA does not apply retroactively to Park's claim, and this is now law of the case. The Ninth Circuit found it unnecessary to reach this issue, explaining that "Park's unfair trade practices claims survive dismissal on other grounds." Because two of the unfair trade practices claims (one under Connecticut law, one under California law) are based solely on alleged ROSCA violations, and because Park had all his post-ROSCA charges refunded, the only cognizable injury he suffered must be traceable to loss of interest and/or loss of beneficial use of the $48.

Adding to the complexity, Webloyalty's opposition to the certification motion argued that consumers who received a full refund of their membership fees should be excluded from the class definition, and Park said he did not object to this. (Reply Br. (Docket no. 113) at 11:13–15.) This would have the effect of eliminating people from the class who, under law of the case, have suffered cognizable injuries.

The first charge to Park's bank account was made on June 19, 2009. The Court has already held that the EFTA's one-year limitations period began to run as soon as he knew about the charge. The Court also held that under principles set forth in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), he was likely entitled to tolling as soon as *Berry* was filed, *i.e.*, June 25, 2010. But if the limitations period had already run, tolling could not render his claim timely. Because the Court accepted Park's proffer that he did not engage in online banking and first received his bank statement in the mail sometime in July, 2009, the Court held that the pleadings did not show Park's claim was untimely. The Ninth Circuit commented on this holding without expressing either approval or disapproval.

/ / /

## III.  Standards

The proponent of a motion for class certification bears the burden of demonstrating that certification is appropriate. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A party seeking class certification must satisfy the requirements of Fed. R. Civ. P.  23(a) and the requirements of at least one of the categories under Rule 23(b)." *Wang v. Chinese Daily News*, 737 F.3d 538, 542 (9th Cir. 2013).

The four requirements of Rule 23(a) are:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These are commonly referred to as the numerosity, commonality, typicality, and adequacy requirements. The Court must perform "a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart*, 564 U.S. at 350–51. Park seeks certification under Rule 23(b)(3), which applies where common questions predominate over individualized ones and a class action is the superior mechanism for dispute resolution.

"In determining the propriety of a class action, the question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotation marks and citations omitted). *See also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010) (citation and brackets omitted) (holding that the possibility that a plaintiff will be unable to prove his allegations is not a basis for declining to certify a class that otherwise satisfies Rule 23).  The Court ordinarily has no authority to look into the merits of the suit, whether the Plaintiff will prevail on the merits, or whether he

has stated a cause of action. *Id.* at 808 (citing *Eisen*, 417 U.S. at 177–78). But the Court may engage in substantive inquiry when considering issues such as commonality, typicality, and predominance. *Id.* at 808–09. Therefore, the Court considers the merits of the underlying claims to the extent that the merits overlap with the Rule 23 analysis, but does not determine whether Park could actually prevail. *See Wal-Mart*, 564 U.S. at 350–52 (explaining that required analysis often entails some overlap with the merits); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981, 983 n.8 (9th Cir. 2011).

As part of the Rule 23 analysis, for example, the Court may also consider whether the class representative's claims are subject to unique defenses. "A court should not certify a class if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). And the possibility that a class representative will be forced to abandon remedies to the detriment of the class can be relevant to the adequacy of representation analysis. *W. States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002) ("A class representative is not an adequate representative when the class representative abandons particular remedies to the detriment of the class.") *See also Taison Comm'cns, Inc. v. Ubiquiti networks, Inc.*, 308 F.R.D. 630, 641–43 (N.D. Cal. 2015) (rejecting plaintiffs as adequate representatives based on their willingness to forgo damages in order to achieve class certification).

Of course, the Court must consider jurisdictional issues at any time, *sua sponte* if necessary. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 593 (2004). Here, these include chiefly questions of standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–47 and n.6 (2016) (holding that named plaintiffs in class action must personally plead and establish Article III standing). Furthermore, the Court has both the

12cv1380-LAB (LL)

authority and the obligation to monitor the actions of the parties before it, to protect both the absent class and the integrity of the judicial process. *Deposit Guaranty Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 331 (1980); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998).

Although the Court generally accepts the substantive allegations made in the complaint as true, it must also consider the nature and range of proof necessary to establish those allegations. *See In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982); *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 585 (S.D. Cal. 2010). A party seeking class certification cannot rely on mere allegations, but must affirmatively demonstrate that Rule 23's requirements are in fact met. *Wal-Mart*, 564 U.S. at 350. To this end, the Court may consider the parties' evidentiary submissions. *Keilholtz v. Lennox Hearth Products Inc.*, 268 F.R.D. 330, 335 (N.D. Cal. 2010) (holding that at the class certification stage, a court may consider evidence that may not be admissible at trial).

Although the Court must act within the framework of Rule 23, it has "broad discretion" when deciding whether to certify a class. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

## A. Rule 23(a)

Commonality requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). "What matters to class certification is not the raising of common questions . . . but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citation omitted). It is construed permissively, and indeed less rigorously than the predominance requirement of Rule 23(b)(3). All questions of fact and law need not be common to satisfy the rule. *Id.* at 368. One "significant question of law or fact" common to the class may be sufficient to warrant certification. *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 589 (9th Cir. 2012)).

The typicality inquiry under Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). The representative claims do not need to be "substantially identical" to those of absent class members, just "reasonably coextensive." *Hanlon* 150 F.3d at 1020.

Rule 23(a)(4) permits certification of a class only if the "representative parties will fairly and adequately protect the interests of the class." This factor requires that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and that Plaintiffs are represented by qualified and competent counsel who will vigorously prosecute the action on the class's behalf. *Staton v. Boeing,* 327 F.3d 938, 957 (9th Cir. 2003); *Hanlon*, 150 F.3d at 1020.

## B. Rule 23(b)

In addition to establishing commonality, Park must still prove that common questions of law or fact predominate over questions affecting only individual class members. Fed. R. Civ. P. 23(b)(3). The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (quotation omitted).

Superiority requires consideration of four factors. *See Zinser*, 253 F.3d at 1190. They are:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the

12cv1380-LAB (LL)

claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). When analyzing these factors, the Court must "focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190 (internal quotations and citations omitted).

While acting within the prescribed Rule 23 framework, the Court has "broad discretion" to decide whether a class should be certified. *Id.* at 1186.

## IV.    Discussion of Rule 23 Criteria

### A. Numerosity and Commonality

Because the claims all arise from similar enrollment processes, at least some questions of fact or law are present.   These include, among other things, whether the general process Webloyalty used meant consumers gave valid authorization for funds transfer under the EFTA. Because the enrollment processes were similar, a number of questions of fact are likely present as well. Park has briefed this issue, but Webloyalty's brief does not cover it. This is a permissive and less rigorous standard than the predominance standard, and the Court finds this requirement is met. Numerosity is also easily satisfied.

### B. Typicality

Here, Park hits his first hurdle. His claims are typical of the class in some ways, but atypical in several others.  Park's claims arise from the same general kind of enrollment process as the absent class members' claims, and are governed by the same law.  As a general matter, the claims are based on a similar pattern of behavior by Webloyalty, and are governed by a similar body of law. Park's certification motion surveys these similarities, which are substantial. But his claim differs from the class claims in several significant ways. His EFTA claim is subject

to a statute of limitations defense that will require an individualized inquiry. His damages for ROSCA-based claims are different in kind than those the post-ROSCA class. He also seeks relief that he has no standing to pursue, although other putative class members may.

The underlying facts differ somewhat as well, both between Park and the class, and across the class.

### 1. Factual Basis for Park's Claims

Park has no memory of enrolling, and is unable to say, even with the benefit of discovery, what representations or disclosures Webloyalty made to him at the time. He cannot rely on anything the web pages he looked at said or neglected to say as having misled him. Rather, he relies on the "dynamic enrollment" theory, *i.e.*, that even if adequate disclaimers were given, the process itself was deceptive and rendered them ineffective. *See Park*, 685 Fed. Appx. at 591–92 (describing Park's theory). He has not directly alleged what about the process was deceptive, but instead relies on indirect evidence, including statistical evidence regarding the number of members who make use of their membership, anecdotal evidence in the form of customer complaints, and a Senate report regarding Webloyalty's earlier enrollment process. He also intends to rely on expert testimony.

Park alleges he was enrolled using the data pass process, which ROSCA outlawed. His debit card was charged and his bank account debited both before and after ROSCA's enactment, but he was given a full refund of the charges after ROSCA's enactment. Park contends he received no benefit from his membership, which he did not know he had purchased. In opposition, Webloyalty points to evidence that he logged into the website on the day he enrolled, that he logged in twice more after that, and that Webloyalty sent him 27 emails about his membership, including two sent the day he enrolled. The initial email (Def.'s Appx. at 2) tells new members they can log in directly by clicking on the links in the email. That does not necessarily show Park opened or read the email, although that

appears to be one way he could have logged in. The email mentions the coupon and gives instructions for how to redeem it. It also mentions (though not prominently) that the monthly fee, to be charged to Park's credit card, was $12. Although the emails were sent to Park, the salutation used his minor son's name because Park had used that name when buying a gift certificate. Park denies receiving any of the emails.

### 2. Factual Basis for Classwide Claims

Park argues that the class members' enrollment experience was similar to his. Webloyalty has pointed to evidence, which Park does not dispute, that various parts of the enrollment process changed many times during the relevant period, including the appearance of the web pages and email notifications sent to enrollees. Park argues, however, that these were so minimal as to be immaterial.

Most of these changes appear to be minor, but the Court cannot agree with Park's contention that they were immaterial. Because Park is relying on a dynamic enrollment theory, changes to a warning's font size and color, and the ease with which information is accessed are all material.

By way of example, one of the pop-up clickable buttons offering a discount coupon towards an Allegiant Air reservation was accompanied by the statement "By clicking above, you can claim your reward from our preferred partner. See details." (Def.'s Appx., Ex. 3 at 47.) At another time, a similar button was accompanied by the statement "By clicking above, you can claim your reward from our preferred partner, Reservation Rewards." (*Id.*, at 46.) The second obviously provides a greater degree of warning about what the consumer is agreeing to than does the first, because it names a partner company that is not Allegiant Air. Another pair of similar buttons offered a discount coupon for FTD.com. One (*id.*, at 50) included a statement like that in the first example. A different button provided much more detailed information: "By clicking above, you can claim your incentive from Webloyalty when you join their service. Terms and conditions apply." (*Id.*, at

49.) These are examples, but are not the only variations. The layout, design elements, wording, and font size and color also varied substantially among the pages, such that the particulars of the page each customer looked at likely made a significant difference as to how likely he or she was to be misled. (*See* Def.'s Appx., Ex. 4.)

Among other things, some but not all of the pages prominently mentioned the names of the membership programs, and congratulated customers on joining the program or being a new member. Some included stock photos illustrating things that members could obtain discounts on. In some cases these were clearly unrelated to the coupon (*see* Defs.' Appx. at 52, 60–61), while in others they appeared closely related. (*See id.* at 57–58.)   The variation in the pages' layouts could also be significant; one page walked customers through the enrollment process, step by step, with large buttons next to each step, and the coupon offer filled only about a quarter of the page. (*Id.* at 62.)

The enrollment process varied somewhat as well, depending on the retailer partner's choices. Park argues that Webloyalty used one of two methods of obtaining authorization: either customers had to enter their email address twice, or they entered their email address twice plus the last four digits of their account number.[5] Webloyalty has also offered evidence that not all retailers used data pass, and that different enrollments required entry of different information.  Some required customers to enter part of their credit or debit card number and some others required customers to re-enter their entire credit or debit card number. Webloyalty's evidence shows that some customers would not be included in the class definition, because they were not enrolled using data pass.  As to others, it shows that the enrollment and authorization process would have been different for

---

[5] The evidence Park cites shows only that these were two of the methods used, not that they were the only two. (Pl.'s Appx, Ex. 1 at 6.)

12cv1380-LAB (LL)

different customers. Some arrangements may have given them greater notice than others that they were enrolling in a membership. For example, customers who had to enter part of their account number may have had more reason to realize they were not merely receiving a free coupon but were going to have to pay for something. Those who had to enter their entire account numbers would likely have had even more reason. (*See* Defs.' Appx. at 62 (web page requiring customers to choose a credit card type, then enter their full account number and the expiration date).)

What a jury would make of these differences is unknown, but they are not immaterial. Variations in the web pages' appearances or in enrollment or authorization process do not necessarily render claims atypical or inappropriate for resolution on a classwide basis. But the material differences between different customers' enrollment experiences are a factor to be considered.

The class definition makes no distinction among customers who knew they were signing up for one of Webloyalty's programs, or who made use of the membership programs later, and those who did not knowingly sign up or make use of the membership program.

### 3. EFTA Limitations Period

Park's EFTA claim was initially dismissed because it appeared to be time-barred. For reasons discussed in earlier orders, his claim was timely only if he learned the basis of his EFTA claim on or after June 25, 2009. Because his account was charged on June 19, 2009, it appeared he had notice earlier, and his claim was time-barred by several days even with the benefit of tolling. But Park amended his complaint, alleging that he did not engage in online banking and that the first time he could have received notice of the June 19 charge was when his bank statement arrived in the mail, which was sometime in July. Because of this, the Court allowed his claim to go forward.

/ / /

Now, however, Park admits he <u>did</u> engage in online banking in 2009 (*see* Def.'s Appx. at 101–03), and Webloyalty has pointed to his bank statement as evidence his claim is time-barred. The June 19 charge for "Complete Savings" is listed, along with a toll-free phone number. Like the other entries, which identify the merchants' location, the charge says this merchant was based in Connecticut. The closing date on this statement was June 22.

Webloyalty also points to evidence that Park logged into the Complete Savings member site the same day he signed up, that he signed in twice more before he says he realized he had signed up for the program, and that he received numerous emails that would have put him on notice that he had been enrolled, all before he says he discovered he was enrolled. Although he did not respond to Webloyalty's assertions in his reply brief, at argument Park's counsel said Park didn't remember logging in, and posited that Webloyalty itself had done it. (Hrg. Tr. at 4:12–5:13.) His argument was based on Webloyalty's practices in 2003. (*Id.* at 5:2–6.)

The Court of course is not adjudicating the statute of limitations defense now. But the fact that it has been squarely raised from the start of this litigation, and Webloyalty has continued to raise and assert it diligently at every opportunity, suggests it will continue to be an issue. This is understandable because this is perhaps Park's most important claim, and it is clearly vulnerable. It remains a rather thorny and fact-intensive issue. The facts necessary to establish this defense (*e.g.*, the particulars of Park's online banking habits, and whether he had notice on June 19 or at least within a few days), are all unique to him. The fact that this unique defense persists and is likely to persist is a relevant consideration.

### 4. ROSCA-Based Damages

Park received a full refund for the $48 he was charged after ROSCA was enacted. The class members, however, were not. Park instead argues that he was injured because the $48 was withdrawn from an interest-bearing account. He

also argues he could have made beneficial use of the money during the four months it was not in his account, by paying off debt. The latter argument is necessarily a fallback; he could not have both drawn interest on the money and also used it to pay off other debt. Park has also not suggested that he would actually have paid off debt, merely that he could have done so.

The important fact here is that the class members' injury is different; their money was taken and not given back, and the TAC seeks disgorgement. Park, by contrast, does not need the equitable remedy of disgorgement. He must seek damages for temporary deprivation of his money, which none of the post-ROSCA class members are seeking. Nor could they seek such damages on a classwide basis; determining the amount of interest forgone or the value of lost opportunities would necessarily entail highly individualized fact-finding.

Although Park seeks actual damages, they are so minuscule as to be less than even the smallest nominal damages, and quite a bit less than any absent class member. Park's Wells Fargo statement for activity ending June 22, 2009 shows that he was paid five cents' interest on a balance of $1,552.46. Although the parties have not provided any statements for the four months of 2011, if the interest rate on his account remained similar, Park would have been deprived of roughly a third of a cent in interest during the first four months of 2011. Although an extremely small claim is not necessarily atypical, *see South Ferry LP No. 2 v. Killinger*, 271 F.R.D. 653, 660 (W.D. Wash. 2011), Park's claim is based on a different theory than the Post-ROSCA Class's claims, and requires somewhat different proof. This will also be discussed in the adequacy of representation section below.

### 5. Injunctive Relief

The TAC requests prospective injunction relief for Park's unlawful trade practices claims. Article III standing is required in order for a plaintiff to seek injunctive relief. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528

U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing for each form of relief sought."). This requires the threat of actual, imminent injury; "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Cases involving false or misleading representations to consumers present a special problem, because many consumers are unlikely to rely on or otherwise be harmed by the alleged misrepresentations in the future. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018). A cheated or deceived consumer may, but does not necessarily, have standing to seek injunctive relief. *Id.* (giving examples of how a consumer could establish standing to enjoin future deceptive practices). Park has not shown that he is reasonably likely to sign up by accident for any of Webloyalty's membership programs again, or that there is any other imminent threat of injury to him from anything he has accused Webloyalty of doing. He therefore does not have standing to seek injunctive relief, although a number of class members likely do.

### C. Predominance

The parties' briefing focuses primarily on this issue. Park's motion points to a number of common issues, which he argues predominate over individual issues. Most of these focus on the enrollment process and the law governing the authorization of charges. (Mot. at 14:6–15:12.) The Court agrees that most of these are common to the class. The main reason some of them are not fully common to the class is that they are based on a variable enrollment process.

Webloyalty points to a number of issues that are not common to the class, and would need to be decided on an individualized basis. These include the class members' informed consent, and their reliance. The Ninth Circuit's decision makes clear these are both issues in this case. *See Park*, 685 Fed. Appx. at 592–92.

Park argues, essentially, that because Webloyalty used the same general process or method to induce all class members to sign up, the claims are amenable

to adjudication by class action. His briefing suggests that any authorization consumers gave to charge their cards in the course of such a process must be invalid. The problem is that the process was not so utterly flawed or unfair that meaningful consent was impossible. The evidence shows that the disclosures Webloyalty gave during the enrollment process, at the very least, could be adequate to shield Webloyalty from any liability. Earlier, the Ninth Circuit reversed the Court's decision that Park had failed to plead a claim; the panel held that the Court had improperly relied on documentation of disclosures that were given during the enrollment process. *See Park*, 685 Fed. Appx. at 591 (holding that judicial notice was improper), 592 (holding that reliance on documentation should be reserved for a later stage of litigation). But at the class certification stage, reliance on evidence is both permitted and appropriate. *See Wal-Mart*, 564 U.S. at 350.

The variations in the enrollment method potentially create some individualized issues. But a greater problem is that each claim Park is bringing requires something more than merely showing what Webloyalty said or did. The claims require a showing, not just of the potential for customers to be misled or deceived, but that they actually were misled or deceived, and that their cards were charged without valid consent. Some of the claims also require showing something else as well. For example, the EFTA claim requires a showing that class members did not receive a benefit.

A class may not be defined so broadly that it includes many members who were not harmed by a defendant's allegedly unlawful conduct. *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016). That is a problem here. For example, the class as presently defined includes everyone whose cards were charged, including customers who intended to enroll in Complete Savings or one

/ / /

/ / /

12cv1380-LAB (LL)

of the other membership programs and actually made use of their memberships.[6] Those customers probably cannot establish an EFTA claim. *See* 15 U.S.C. § 1693a(12) (defining an unauthorized electronic fund transfer to require, among other things, that the consumer "receives no benefit" from it). As to some of the claims, it likely includes members who may not have realized during the enrollment process what they were doing, but who were notified immediately afterward by email and realized that they had.

The email Webloyalty says it sent Park, which Park denies receiving, would have given class members clear notice that they were enrolled in a membership program and had not merely signed up for a free coupon. (*See* Def.'s Appx. at 2.) While it is possible they thought the emails were spam and ignored them, or that the emails ended up in their email accounts' spam filters, any class members who read the email would have had notice that the coupon they requested had resulted in their being enrolled in a membership program for which they would be automatically charged $12 per month. How many actually realized this is another question.

Some of these problems might be addressed by defining the class differently. For instance, the class might be redefined to exclude anyone who made use of one of the membership programs. But even this does not solve the problem. It is common knowledge that people buy memberships or subscribe to services they intend to use but never do. In view of the disclaimers Webloyalty provided, an unknown number of class members likely realized what they were signing up for, and decided to enroll in one of the membership programs anyway. In those cases, informed consent would prevent Webloyalty from being liable under any theory

_____

[6] Park offers no evidence and nothing else in the record shows how many of those who signed up for Complete Savings or one of the other membership programs actually used them.

12cv1380-LAB (LL)

even if the members later changed their minds or neglected to use the membership discounts they had purchased. The fact that they had not used the discounts, in other words, does not by itself show they have a claim. Separating someone in this position from the class would require individualized fact-finding.

These problems are more pronounced in the state law causes of action for civil theft, money had and received, conversion, and unjust enrichment, although Park's certification motion only seeks certification of the conversion claim. Still, conversion requires a showing that a plaintiff was deprived of ownership or possessory rights by the defendant's wrongful act. Park contends this "turns on common evidence, because it is based on Webloyalty's conduct." (Mot. at 102–1, 8:2–8.) But misrepresentations or a scheme intended to deceive, even if proved, do not establish a claim for conversion. Under California law, plaintiffs suing for conversion must also show they did not consent to having their property taken. *Bank of N.Y. v. Fremont Gen'l Corp.*, 523 F.3d 902, 914 (9th Cir. 2008). Under California law, consent need not take any particular form, and can be implied by a plaintiff's action or inaction. *Id.* (citing *Farrington v. A. Teichert & Son, Inc.*, 59 Cal. App. 2d 468, 474 (1943)). In this respect, conversion claims are even harder to prove than EFTA claims. For example, if class members realized or led Webloyalty to believe they knew they were being charged for memberships and did nothing, they would have failed to establish the element of non-consent. At least some class members apparently realized they were being charged.[7]

A related issue is whether class members received, opened, and read the emails Webloyalty sent to class members notifying them of their membership, or

_____

[7] To support his claims, Park intends to rely on scripts that Webloyalty's representatives used when customers called to ask about charges on their accounts. The apparent goal was to persuade customers to keep their memberships and allow Webloyalty to keep charging them. The exhibits do not include these scripts, however.

any follow-up emails gave them notice that in requesting a coupon they had signed up for a membership program for which they would be charged. Class members who received emails and realized they were being charged, either immediately after enrollment or some time later, would have either reduced claims or perhaps no claim at all.

With regard to consent and reliance more generally, the fact that Park is relying on the deceptiveness of the general process under a "dynamic enrollment" theory is significant. If he could point to something that all class members were told or not told, or even a group of communications that he believes were deceptive, the inquiry might be different. Instead, it depends on methods of communication that he alleges were intended to cause customers not to notice the disclosures. For example, he alleges that after clicking on the coupon offer, a pop-up window appeared on customers' screens, asking them to enter their email address and click on a confirmation button. (TAC, ¶ 10.) "Customers naturally assume that they are providing their email address to receive the coupon . . . ," Park alleges. (*Id.*) The pop-up window allegedly "includes voluminous language in relatively small text that is not visible without scrolling and maximizing the window." (*Id.*) Webloyalty's purpose in doing this is allegedly to "discourage consumers from reading the small print and to enroll those unsuspecting consumers who do not see the 'terms and conditions' and disclosures provided." (*Id.*) The allegations rely heavily on allegations about customers' mental states, *e.g.*, "unsuspecting," "unknowingly," "believe and rely," and so on. (*Id.*, ¶ 10–11, 13.) But whether any given class member in fact did not see the disclosures, or was unknowingly enrolled in a membership program is unknown, and cannot readily be known without individual fact-finding. The allegations at most show that the enrollment process was intended to lead more customers to enroll than would have enrolled if the disclosures had been more prominent or the enrollment

/ / /

process more obviously labeled as such. At best, this means most of the class has a valid claim.

Furthermore, although the TAC seems to imply that the class does not include anyone who saw the disclosures (because they did not enroll), there is no evidentiary support for this. Rather, exemplars of web pages and pop-ups that Webloyalty has provided strongly suggest that a good number of people who enrolled were given adequate disclosures, which they probably saw. This is not a case where the entire class was deceived; rather, there is an unknown but significant number of class members who were given adequate disclosures and realized what they were signing up for. Park has not suggested any reasonable way the latter could be excluded from the class without individualized fact-finding.

Webloyalty has also pointed to individualized statute of limitations issues in connection with EFTA claims.[8] As discussed above, Park's EFTA claim is time-barred if he had reason to know about it earlier than June 25, 2009. But the same is true for all class members. If they were bringing suit in their own name, they would have to invoke California's discovery rule, *i.e.*, to show they did not know the factual basis for their EFTA claims before June 25, 2009. This alone would require a large amount of individualized fact-finding.

### D. Adequacy of Representation

Park's motion makes strong arguments for his adequacy as class representative, and Webloyalty has not offered any argument in opposition. The briefing raises some concerns, however. Most of these are discussed in the typicality analysis above. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (noting that adequacy inquiry tends to merge with commonality and

---

[8] The parties' briefing discusses matters the Court has already ruled on, such as tolling. For purposes of this order, the Court is treating Park and the class as entitled to tolling beginning on June 25, 2010.

typicality criteria). But the Court also has concerns about Park's willingness and ability to represent the class vigorously, and about conflicts of interest between him and the class. *See Staton,* 327 F.3d at 957.

Park's EFTA claim is subject to a statute of limitations defense, both based on the fact that he did engage in online banking and based on the fact that he logged into his account on the day he enrolled. While he may prevail on this defense, Webloyalty's focus on it shows it will be litigated. While the defense is not unique to him—all other class members will also have to show their claims are timely—the facts of his defense are unique. He will likely be forced to expend time and effort on this, possibly to the detriment of the class. *See Just Film*, 847 F.3d at 1116 ("A court should not certify a class if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'")

The fact that Park must sue under a different legal theory than the absent post-ROSCA class members is a problem as well, even though his alleged injury stems from the same underlying conduct. In addition to the typicality problem noted above, the fact that he is suing for damages rather than disgorgement, and that his claim will involve different proof creates a problem. Among other things, it means he and Webloyalty are entitled to a jury trial as to this one claim, whereas the class is not. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990). The fact that he will have to prove indirect damages means his claim is harder to establish than the absent class members' claims. He has to prove what interest he would have earned, or what beneficial use he would have made from the $48, whereas the class merely has to show that their money was taken and not refunded. Furthermore, the fact that his claim is minuscule compared with the rest of the class, while not disqualifying, is a problem. Although

/ / /

/ / /

class actions generally settle rather than go to trial, these irregularities provide an incentive to settle for less than the fair value of the class's claims.[9]

The fact that Park lacks standing to seek injunctive relief means he cannot represent a class that is seeking injunctive relief. *Ellis*, 657 F.3d at 986 (holding that named plaintiffs in class lacked standing to sue for injunctive relief even if some class members possessed standing); *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief.") In order to remain class representative, he would have to abandon this remedy. This pits his interests against the class's interests, and makes him less adequate as a representative. *See W. States Wholesale, Inc.,* 206 F.R.D. at 277 ("A class representative is not an adequate representative when the class representative abandons particular remedies to the detriment of the class.")

Another problem that the briefing on this motion has made apparent is that Park appears willing, without explanation, to trade away some of the class's remedies. His own claim, as representative of the California post-ROSCA class, is based on charges that were later fully refunded. Yet in his reply brief, he acceded to Webloyalty's suggestion that people who had received a full refund should be excluded from the class. (Reply Br. at 11:13–15.) Admittedly, those he has agreed to exclude from the class would have to rely on a "loss of beneficial use" theory as to all their claims, and not just one claim as Park must do. At the same time, they are the same kinds of claims. Park has offered no explanation for his decision, and his reasons for agreeing to this are ambiguous. It might be purely strategic,

---

[9] Depending on which other claims survived summary judgment, Park's claim would be tried first to a jury, and the Court would afterwards be bound by the jury's determination when deciding the disgorgement issue. *See Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016).

because Park recognizes it would be difficult to litigate such claims on a classwide basis—although, if that is so, it is unclear why Park's own claim belongs in the case. On the other hand, it might also suggest divided loyalties or a lack of concern: Park is pursuing this claim on his own behalf so he can be class representative, while agreeing to exclude from the class others with the same claim.

Another problem with Park's adequacy is that he does not remember the enrollment process and is unable to testify about how he enrolled and how he was deceived. Even after discovery, he has not alleged what process he went through, what disclosures he was given or not given, and so on. His counsel argued that his lack of memory made him typical, because most class members would likely not remember enrolling. But typicality focuses on the parties' claims or defenses. Fed. R. Civ. P. 23(a)(3). However common it might be among class members, forgetting the enrollment process does not make Park's claims any more typical, because memory of the process is not part of Park's or the class's claims. Park's lack of memory has also forced him to rely on indirect evidence in support of his "dynamic enrollment" theory, rather than relying on what actually appeared on the screen during the enrollment process and how it was displayed. If Park could point to some kind of direct evidence of deception during the enrollment process, such as his own experience, there would be fewer individualized issues and this would be a stronger candidate for class action treatment.

### E. Superiority of Class Action

A class action is superior when it will reduce the costs inherent in litigation and promote efficiency, and the class members realistically have no other way to vindicate their rights. *Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234–35 (9th Cir. 1996).

Here, the amounts sought are fairly small. Bringing them all together in one class action is likely to be more efficient and to reduce the costs of litigation. Many

12cv1380-LAB (LL)

of the claims are for several hundred dollars or more, and some could realistically be brought in small claims courts where plaintiffs would not have to pay an attorney. But in general, claims of that amount are more efficiently litigated as a class action, provided a class action is feasible. *See Rannis v. Recchia*, 380 Fed. App'x 646, 651 (9th Cir. 2010) (suggesting that trying claims for $600 or less would be costly and inefficient).

As discussed above, the fact that several of the claims require individual factual inquiries adds to the difficulty of managing a class action.

**Conclusion and Order**

Although this order does not discuss every argument in the pleadings, the Court has considered them as part of its analysis. The Court has also considered counsel's arguments at the hearing.

The Court finds the commonality and numerosity requirements are met. The typicality requirement is only partially met. Some of Park's claims are not typical of the class, and he is subject to a statute of limitations defense based on facts unique to him. He also lacks standing to seek injunctive relief, even though at least some class members likely have standing. Park also does not remember the enrollment process, which means he cannot point to anything Webloyalty said or failed to say and instead must rely on indirect evidence to show that class members likely did not see the disclaimers and likely did not knowingly consent to having their cards charged. This, however, requires individualized fact-finding. With a different class representative who remembered the enrollment process, many of these individualized issues would be eliminated.

In addition, the class's EFTA claims may be time-barred depending on when they first knew Webloyalty was charging their accounts. This too would require extensive individualized fact-finding. Although a class action would be a superior method of resolving these claims, the individualized fact-finding would render it

/ / /

12cv1380-LAB (LL)

unmanageable here. And for the same reasons, the Court also finds that individual issues predominate.

Park cannot represent the class as to some claims and theories, some of his claims are different from the class's, and one of his claims is subject to a unique defense. He also likely has some conflicts of interest with the class members and may not represent their interests vigorously. For these reasons, the Court finds him not fully adequate as a representative.

A class action would be a superior method of adjudicating the class's claims, if a class could be certified. But having considered all the relevant criteria, the Court concludes that a class should not be certified.

The motion (Docket no. 102) is **DENIED**.

**IT IS SO ORDERED**.

Dated: March 15, 2019

Hon. Larry Alan Burns
Chief United States District Judge

12cv1380-LAB (LL)